UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JEROMY A. DAVIS,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:23-CV-519 JD |

**OPINION AND ORDER**

    Plaintiff Jeromy Davis appeals the denial of his claims for disability insurance benefits under Title II of the Social Security Act. Mr. Davis raises three principal issues: he insists that the Administrative Law Judge failed to submit an MRI report for review by an expert; ignored a line of evidence contrary to her decision; and allowed a vocation expert to use faulty methodology to estimate the number of jobs in the national economy that Mr. Davis can allegedly perform. For the reasons below, the Court will remand the case to the Agency for further consideration.

    A. **Background**

    With the exception of about six months at the end of 2022 and beginning of 2023, Mr. Davis has not had substantial gainful employment since September 2018, the alleged onset date of his disability. He was then 33 years old. In 2019, he applied for disability insurance benefits with the Social Security Administration, claiming that he was disabled because of back pain and depression. His claims were denied, leading to a review by an Administrative Law Judge ("ALJ"), who also denied his claims. (R. at 12.) After the Appeals Council denied his request for

review, he appealed to the district court. The district court reversed the ALJ's decision and remanded the case. (R. at 1189.)

On June 1, 2021, before the case was remanded, Mr. Davis filed a new Title II application. The Appeals Council ordered the ALJ to consolidate the two claims. (R. at 1192.) On August 18, 2023, the ALJ returned an unfavorable decision (R. at 1062).

The ALJ employed the five-step process to determine whether Mr. Davis is disabled. At Step 1, the ALJ found that Mr. Davis "did not engage in substantial gainful activity in 2018 after the alleged onset date, 2019, 2020, 2021, January 2022 through October 2022, and April 21, 2023, to the present." (R. at 1046.)

At Step 2, the ALJ determined that Mr. Davis suffered several severe impairments: "degenerative disc disease of the cervical spine, degenerative disc disease of the thoracic spine, degenerative disc disease of the lumbar spine, asthma, and attention-deficit hyperactivity disorder (ADHD)." (R. at 1046.)

On the other hand, the ALJ concluded at Step 3 that none of these impairments, by themselves or together with each other, met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1046–47.) Likewise, the ALJ found that his mental impairments do not cause at least two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria" so as to meet a listing. (R. at 1051.)

At Step 4, the ALJ made his RFC determination. He found that Mr. Davis

has the residual functional capacity[1] to perform light work as defined in 20 CFR 404.1567(b)[2] except the claimant can frequently handle and finger bilaterally; can occasionally reach overhead bilaterally, climb ramps or stairs, stoop, kneel, or crouch; can never climb ladders, ropes, or scaffolds, or balance, as that term is used vocationally. Occasional exposure to fumes, dusts, odors, gases, and poor ventilation. Work with an option to change positions no more frequently than every thirty minutes, while remaining on task. The claimant is able to remain on task, persist, and maintain pace in two-hour increments, with no production rate pace work such as on an assembly line.

(R. at 1051.)

In explaining her RFC determination, the ALJ considered Mr. Davis's claims of pain and exertion limitations. For example, the ALJ observed that Mr. Davis stated that because of his back pain he could not lift 20 pounds, had difficulty sitting, standing, and walking. He said he could neither walk nor stand for more than 30 minutes. He said he had reduced function in his arms due to his neck condition, which caused him to drop things and limited his ability to reach overhead. Mr. Davis also testified that poor weather exacerbates his pain symptoms and that because of his pain, he had significantly disturbed sleep. (R. at 1052.)

After considering Mr. Davis's subjective complaints, the ALJ concluded that he has "underlying medically determinable impairments that could reasonably cause some symptomology," but that there's insufficient "objective medical evidence to substantiate the severity of the pain degree of functional limitations alleged by [Mr. Davis]." (*Id.*)

---

[1] "The [residual functional capacity] reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567

3

**(1) *The ALJ's Summary of Mr. Davis's Ailments Related to his Spine***

In support of her conclusion, the ALJ recounted a series of physical examinations, tests, and treatments that Mr. Davis underwent:

In September 2018 (the onset date), Mr. Davis complained of low back pain with numbness and positive root tension signs. An exam showed that his leg strength was diminished to 4/5. (R. at 1053.) Mr. Davis had an MRI which showed the following:

> at L4-L5, disc degeneration with loss of intradiscal signal but only slight narrowing of the posterior disc space. There was a small degenerative annular disc bulge with superimposed small central/right paracentral broad-based subligamentous disc protrusion slightly indenting the ventral thecal sac. Mild to moderate degenerative facet arthritis and posterior element hypertrophy were also noted. The claimant's L5-S1 level found congenitally narrowed disc space due to transitional anatomy.
>
> . . .
>
> [T]he claimant had a stable small right paracentral disc protrusion abutting the right L5 nerve root but without significant compression or root edema along with stable mild facet hypertrophy. The claimant's L5-S1 level had a mild annular bulge and facet hypertrophy along with stable mild facet hypertrophy.

(R. at 1053.)

A month later, in October 2018, Mr. Davis underwent "diskectomy to treat his back pain." (*Id.*) After the surgery, he reported that he experienced worsening low back and right leg pain. However, his leg sensation was intact, and he walked with normal gait. (*Id.*)

Three months later, in January 2019, Mr. Davis sought treatment for right leg pain. (*Id.*) An MRI conducted at that time "found evidence of mild thoracic spondylosis with only mild degenerative disc changes with small right and a lateral disc bulge/spur." (*Id.*) In addition, granulation tissue extended "through an operative defect along the right lateral margin of the

4

thecal space and surrounding the right L5 nerve foot in the lateral recess." (*Id*.) Mr. Davis was then treated "with a right L5 steroid injection." (*Id*.)

A month later, in February 2019, Mr. Davis underwent an MRI of the neck. According to the MRI report, "at C4-C5, the claimant had a mild diffuse annular bulge without focal disc herniation and only mild central stenosis. The claimant's C5-C6 level had a small annular bulge/osteophyte complex but without focal disc herniation. The claimant had mild central and right foraminal stenosis along with a prominent anterior spur at this level as well." (R. at 1053–1054.) Several physical examinations around this time showed reduced dorsiflexion strength but normal reflexes and normal sensation on both sides of the body. (R. at 1054.) He was treated with steroid injection. (R. at 1053.)

In March 2019, during a physical examination, Mr. Davis complained of tender neck and upper and lower back. He had a positive left leg raise test.[3] His right leg had reduced strength. His reflexes and sensations were intact. He was treated with additional lumbar epidural site injection. (R. at 1054.)

In April 2019, Mr. Davis continued complaining of low back pain. He underwent an EMG which showed chronic neuropathy changes in the right L5 innervated muscles. The right leg reflected normal responses to stimuli. The ALJ noted that Mr. Davis's back and right leg complaints were treated with physical therapy. (R. 786–788, 608–611.)

Mr. Davis continued complaining of pain into December 2019. As a result, he received an epidural site injection into his neck. He was concerned that non-narcotic therapy has not been

---

[3] "[A] positive straight leg raise test is determined when pain is elicited by lower limb flexion at an angle lower than 45 degrees. Patients usually request that the examiner abort the maneuver during the test if the pain is reproduced during the leg straightening." *Straight Leg Raise Test*, National Library of Medicine, https://perma.cc/8EEH-23LL (last visited November 5, 2024).

5

beneficial and sought a different pain management doctor. (R. at 1054.) He continued seeking treatment for his neck and back in January 2020. Upon examination, he exhibited decreased strength in both arms and his neck and back were tender. He had a positive bilateral leg raise test and his low back had reduced range of motion. He walked with a normal gait.

On February 17, 2020, Mr. Davis underwent another MRI of his neck and lower back. The ALJ summarized the MRI report:

> The claimant underwent another MRI of his neck in February 2020. The results found only mild uncovertebral spurring and disc bulging with minimal bilateral foraminal narrowing at C3-C4. At C4-C5, there was moderate uncovertebral spurring and disc bulging with mild spinal canal narrowing. Moderate right and mild to moderate left foraminal narrowing were also noted. The claimant's C5-C6 level had moderate uncovertebral spurring and disc bulging. Mild spinal canal narrowing and severe right to mild to moderate left foraminal narrowing were present as well. C6-C7 had a minimal disc bulge with no spinal canal or foraminal narrowing. An x-ray performed in the same period found moderate to advanced degenerative disc disease at C5-C6.
>
> A February 2020 MRI of the claimant's low back found disc degeneration and a disc bulge with superimposed right paracentral focal disc protrusion and annular tear at L4-L5. Multilevel lower lumbar degenerative facet arthritis/hypertrophy was also observed. However, there was no evidence of definite focal nerve root impingement. There was no evidence of spinal canal or foraminal stenosis.

(R. at 1055 (citations to exhibits omitted).)

During an office visit around this time, Mr. Davis's reflexes, motor strength, sensation, and coordination were normal, and he had full range of motion in his arms and legs. He also walked with a normal gait. (*Id.*)

During an office visit in May 2020, Mr. Davis reported that his "pain significantly affects his ability to perform activities of daily living." (R. at 980.) The doctor notes show that he walked with antalgic gait but without an assistive device. He had a positive leg raise test and his reflexes were depressed but his sensations were intact, and he retained

6

full strength in arms and legs. He continued to receive site injections to treat the pain into and throughout 2023 as well as was prescribed Lyrica and Norco. (R. 1055–66.)

**(2)** *The Opinions of State Agency Physicians*

State Agency Physicians Corcoran and Whitley explained their disability determination on March 27, 2019, and May 21, 2019, respectively. (R. at 105–114; 116–127.) They opined that Mr. Davis could do no more than light work which the ALJ found persuasive. (R. at 1058.) At the same time, the ALJ believed that Mr. Davis was more limited than indicated by the state agency physicians. The ALJ based this finding on Mr. Davis's testimony at the hearing; as well as doctor notes indicating reduced strength, sensation, and numbness; and observations of Mr. Davis walking with antalgic gait. Drs. Corcoran and Whitley did not review any of Mr. Davis's medical records after they issued their reports in March and May 2019 and provided no additional opinions.

**(3)** *The ALJ's Finding that Mr. Davis was not Disabled*

The ALJ summarized her findings in support of the RFC determination by emphasizing again that Mr. Davis's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the record. (R. at 1058.) The ALJ had no trouble believing that the degenerative changes as seen in the imaging scans affected his physical functioning, but according to the ALJ, the treatment notes reflected a more optimistic picture:

> The claimant provided medical imaging of his neck, upper back and low back which show degenerative changes to these areas with associated effects on his nerve roots. It is unquestionable these degenerative changes affected the claimant's physical functioning. The claimant's treatment notes indicated the claimant

7

experienced reduced 4/5 strength in his bilateral lower extremities along with reduced strength in his bilateral upper extremities. The claimant's bilateral upper extremities also experienced reduced sensation and numbness. The claimant was observed to walk with an antalgic gait. However, the claimant's impaired functioning did not appear to be present throughout the relevant period. Numerous examinations found the claimant's strength was intact at 5/5 bilaterally. The claimant's reflexes were normal at 2+. The claimant's sensation and coordination were intact. The claimant was also observed walking with a normal gait. Even when walking with an antalgic gait, the claimant was able to walk unaided.

(R. at 1058–59.)

Given these findings, the ALJ assessed the RFC for light work with limitations as stated above.

At Step 4, the ALJ determined that Mr. Davis is unable to perform any past relevant work. (R. at 1060.) Finally, at Step 5, the ALJ found that, considering Mr. Davis's age, education, work experience, and the RFC, there are jobs in significant numbers in the national economy that he can perform. In particular, she found there are 18,000 positions for inspector and hand packagers; 44,000 positions for markers; and 32,000 positions for routing clerks. The ALJ arrived at this conclusion after questioning a Vocational Expert ("VE") at the hearing.

On December 15, 2023, Mr. Davis appealed the ALJ's decision to this Court.

**B.    Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The

8

threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.  Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

9

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;[4]
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the

---

[4] This step is not used for redetermining disability upon attaining age eighteen. *See* 20 C.F.R. § 416.987(b) ("We will not use the rule in § 416.920(b) for people who are doing substantial gainful activity . . . .")

burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D.  Discussion**

In his appeal, Mr. Davis makes three main arguments. First, he insists that the ALJ "unilaterally reviewed the medical record and played doctor by making functional assumptions regarding [his] limitations." (Pl.'s Br., DE 15 at 9.) Second, the ALJ "failed to consider [his] physical therapy records thus ignoring an entire line of evidence." (*Id*.) Finally, according to Mr. Davis, "[t]he job methodology used by the [VE] when determining the job numbers was unreliable." (*Id.* at 15.) The Commissioner disputes each of Mr. Davis's contentions.

The Court agrees with Mr. Davis's first two contentions, requiring a remand. In light of the case being remanded, the Court need not address the third argument.[5]

**(1)** *Mr. Davis's 2020 Imaging Reports*

Two state agency physicians, Drs. Corcoran and Whitley, explained their disability determinations in March and May 2019, respectively. They opined that Mr. Davis "could perform light work, except [he] can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. [He] can occasionally balance, stoop, kneel, crouch, and crawl." (R. at 1058.) The ALJ found their opinions persuasive to the extent that they limited Mr. Davis to light work, but she was unpersuaded otherwise because they conflicted with some of the medical records. In

---

[5] Mr. Davis also argues in passing that the ALJ erred by ignoring evidence outside the "relevant period" and misconstrued his intermittent attempts at employment, but these arguments, too, can be addressed on remand.

particular, the ALJ noted that "[m]edical imaging demonstrated the claimant's cervical spine, thoracic spine, and lumbar spine had degenerative changes" (*id.*), which caused Mr. Davis to experience neck and back pain with limited range of motion in his neck and back, loss of strength in his legs and arms, and made him walk with antalgic gait (*id.*). As a result, and contrary to the State agency physicians' assessments, the ALJ included in the RFC limitations against balancing and crawling.[6]

While these RFC limitations may be reasonable, the Court is not certain that they are complete. That's because, as Mr. Davis points out, and the Commissioner does not contest otherwise, the ALJ failed to submit the February 2020 neck MRI and X-ray reports (R. at 912, 914) for expert review. Instead, although these reports appear to show a worsening of Mr. Davis's neck condition, the ALJ merely recites them without explaining their significance and without determining whether they have any effect on the RFC.

Here's how the ALJ summarized both reports. In February 2019, Mr. Davis underwent a neck MRI. According to the MRI report, which the ALJ incorporated into her decision, Mr. Davis's "C5-C6 level had a small annular bulge/osteophyte complex but without focal disc herniation. [Mr. Davis] had *mild* central and *right foraminal stenosis* along with a prominent anterior spur at this level as well."[7] (R. at 1053–54 (emphasis added).) A year later, in February 2020, Mr. Davis underwent another neck MRI which showed that his "C5-C6 had . . . *severe right* and mild to moderate left *foraminal narrowing* . . . ." (R. at 1055 (emphasis added).) In

---

[6] The ALJ notes the limitation against crawling in her discussion of the RFC assessment (R. at 1058), and she included it in the hypothetical to the VE (R. at 1104), but she appears to have inadvertently omitted it from the RFC in her decision (R. at 1051).

[7] In discussing this report, the ALJ stated that "[t]he results were consistent with prior imaging discussed above." (R. at 1053.) However, this is the first neck MRI mentioned in the ALJ's decision, so any claim of consistency with earlier imaging is inaccurate.

addition, the report of the neck X-ray states that "[t]here is moderate to *advanced* degenerative disc disease at C5-C6 with endplate spurring and disc space narrowing." (R. at 914, 1055 (emphasis added).) There was no further mention, and no discussion at all, of the February 2020 neck MRI or neck X-ray.

Except for those trained in the art, it's difficult to assess the full impact of the February 2020 MRI and X-ray report, but they certainly suggest a decline in Mr. Davis's condition. Yet neither the ALJ nor this Court are qualified to interpret these reports. This is also true of the Commissioner who asks the Court to discount them purportedly because they are similar to the earlier reports (from early 2019) that Dr. Whitley reviewed before submitting the May 2019 opinion. Rather, the reports should be interpreted by an expert and only then should the ALJ rely on them in forming Mr. Davis's RFC. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) ("Fatally, the administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence."). After all, this evidence undermines the ALJ's reasoning that "the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitation alleged by [Mr. Davis]." (R. at 1052.) While Mr. Davis claims that, by failing to submit the reports to an expert the ALJ is "playing a doctor," in a strict sense, the ALJ is merely parroting the reports; they stand alone unrelated to anything else. *See Goins*, 764 F.3d at 680; *cf. Arnold v. Kijakazi*, No. 19-3040, 2022 WL 409685, at *3 (C.D. Ill. Feb. 9, 2022) ("While the ALJ did not assess or analyze the results of the MRI as in *McHenry*, the ALJ failed to consider those opinions which resulted in a de facto medical judgment, thereby violating the principle of *Goins* and *McHenry*. . . . It is speculation to presume that the opinions of Dr. DeBartolo and the state agency reconsideration physician, Dr. Hinchen, would not have changed if they had been aware

13

of the additional medical imaging."). Insofar as "Social Security proceedings are inquisitorial rather than adversarial," *see Sims v. Apfel*, 530 U.S. 103, 110–11 (2000), and "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits," *id.* at 111, the ALJ should have submitted the 2020 imaging reports for expert review and thus complete the record.

The Commissioner argues that the reports need not be submitted to an expert because Mr. Davis failed "to obtain a single medical opinion to support his claim." (Def.'s Br., DE 21 at 6.) The Commissioner cites 20 C.F.R. § 404.1512, which according to him establishes Mr. Davis's burden to provide a medical opinion aiding his argument. (*Id.*) But § 404.1512 says no such thing. Instead, it speaks of plaintiff's burden to produce evidence, not opinions:

> Your impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source.

§ 404.1512; *see also Greer v. Kijakazi*, 2023 U.S. App. LEXIS 17923, *11 (7th Cir. 2023) ("In support, the Acting Commissioner cites *Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021), in which we concluded that substantial evidence supported the ALJ's decision because the claimant had offered 'no opinion from any doctor to set . . . limits . . . greater than those the ALJ set.' Greer's burden, however, was to produce medical evidence, not an opinion."). And as noted, the evidence here suggests that Mr. Davis's medical condition may have worsened in February 2020. For these reasons, the Court finds that a remand is necessary so that the ALJ can submit the two reports for an expert's review. *See Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) ("The MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion."); *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021)

14

("This court has stated repeatedly that an ALJ may not 'play[] doctor and interpret new and potentially decisive medical evidence without medical scrutiny.'").

The Commissioner also argues that "a new expert opinion is unnecessary unless the claimant presents 'new and potentially decisive medical evidence' that significantly 'changes [t]he picture' upon which extant opinions were based." (Def.'s Br., DE 21 at 7 (quoting *Goins*, 764 F.3d at 680).) The Commissioner insists that the 2020 imaging reports aren't such evidence because they are similar to the 2019 reports which Dr. Whitley reviewed. (*Id.*) But the Commissioner ignores the fact that the 2019 report of the neck MRI referenced "mild . . . right foraminal stenosis"[8] at C5-C6 level (R. at 1053–54), whereas the 2020 imaging reports refer to "severe right . . . foraminal narrowing" (R. at 1055) and "moderate to advanced degenerative disc disease" (R. at 914, 1055). In addition, the Commissioner overlooks that in *Goins*, the case upon which he is relying, the Seventh Circuit faulted the ALJ for failing to submit to medical scrutiny an MRI report that was not reviewed by the consulting physicians. "Instead, playing doctor (a clear no-no, as we've noted on numerous occasions; *see, e.g.*, *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)), the administrative law judge summarized the results of the 2010 MRI in barely intelligible medical mumbo jumbo . . . ." *Goins*, 764 F.3d at 680. As in *Goins*, the 2020 imaging reports are new and potentially decisive medical evidence because they suggest the worsening of Mr. Davis's condition.

**(2)** *Mr. Davis's Physical Therapy Records*

---

[8] Stenosis is "a narrowing or constriction of the diameter of a bodily passage or orifice." Merriam-Webster Medical Dictionary, https://perma.cc/6S4Q-NQQF (last visited November 13, 2024).

There's yet another basis to remand this case for additional review. Mr. Davis's record contains multiple notes from his physical therapy appointments that the ALJ completely omitted from her discussion. Instead, the physical therapy is mentioned in passing: "[Mr. Davis's] back and right leg complaints were treated with physical therapy." (R. at 1054.) This oversight amounts to ignoring a line of evidence contrary to the ALJ's determination. *See Dunn v. Saul*, 794 Fed. Appx. 519, 522 (7th Cir. 2019) ("Although under no obligation to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to his ruling. The ALJ here was free to consider Dunn's employment records and expressly decide that they deserved little weight, but to disregard them completely was impermissible.").

Mr. Davis first attended physical therapy in February 2019. The notes from the first visit state that "[e]valuation has determined decreased functional status for this patient . . . These impairments have led to decreased tolerance to functional sitting time and ability to function with work activities such as bending and lifting." (R. at 787.) Problems included decreased range of motion and "decreased strength limiting functional activities." (*Id*.) After his first visit, Mr. Davis did not return for a year and a half, until October 2020. He then attended physical therapy for about two months. The notes from those visits describe Mr. Davis's physical health at the time: "[s]itting posture showed decreased lumbar lordosis and forward rounded shoulders. Very little lumbar curve reversal with ROM testing" (R. at 1956, 1990); "moderate" limitation in walking and bending and a "severe" limitation in lifting (R. at 1989); "[m]ovement restrictions causing joint and muscle dysfunction, pain limits functional activities, decreased range of motion preventing full functional activities, and decreased strength limiting functional activities" (R. at 1959.) Because the records appear to support Mr. Davis's claimed limitations, the ALJ needs to

16

evaluate them on remand.[9] At the very least, the ALJ was required to address the records to build the proverbial logical bridge.

### E. Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: November 15, 2024

/s/ JON E. DEGUILIO
Judge
United States District Court

---

[9] The Commissioner failed to respond to Mr. Davis's argument related to the ALJ's omission to address the physical therapy records and therefore waived argument on the issue. *See April P. v. O'Malley*, 2024 U.S. Dist. LEXIS 157095, *18 (S.D. Ind. Aug. 1, 2024) ("If the Commissioner does not respond to an argument raised by the claimant, it is unclear whether this is a tacit admission by the Commissioner that the ALJ erred or whether it was an oversight. Either way, the Commissioner has waived any response to this argument.") (quotation marks, brackets, and citation omitted).